## C. T. Barr, Defendant in Error, v. American Copying Company, Plaintiff in Error.

### Gen. No. 13,912.

CONTRACT—*particular instrument construed as one of employment.* Held, that the contract set forth in the opinion in this case was one of employment providing a fixed salary and expenses during a specified period rather than one merely of bargain and sale of merchandise.

Assumpsit. Error to the Municipal Court of Chicago; the Hon. FRANK CROWE, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed July 6, 1908.

LESLIE A. NEEDHAM, for plaintiff in error.

WINSTON, PAYNE, STRAWN & SHAW, for defendant in error; EDWARD W. EVERETT, of counsel.

MR. JUSTICE BROWN delivered the opinion of the court.

The plaintiff in error—the defendant below—is attempting in this court to reverse a judgment for $1,000 against it, entered by the Municipal Court, sitting without a jury, on August 14, 1907. The suit was one of the fourth class under the Municipal Court Act.

The parties to it had, on December 5, 1906, made a contract under seal, of some paragraphs of which we give a transcript and of some an abstract:

(Opening paragraphs in full.) "This agreement made and entered into this fifth day of December, 1906, by and between the American Copying Company, a corporation, of the City of Chicago, and State of Illinois, party of the first part, and Mr. C. T. Barr, party of the second part, of the City of Philadelphia and State of New York;

"Witnesseth: That the parties hereto, after a personal interview and examination by said second party of the goods manufactured and sold by said first party,

have embodied the result of all previous and present negotiations into this writing, said agreement being as follows, to-wit:

"1. The said first party engages the said second party in the capacity of sales agent to conduct a sales agency in the city of Rochester, State of New York, for a period of two (2) years from the date that the sales office is opened for the second party as hereinafter provided for, and for and in consideration of the faithful performance and fulfillment of each and all of the several agreements hereinafter contained and agreed to between the parties—the party of the first part agrees to engage the said second party for a period of twenty-four months, and agrees to pay the party of the second part one hundred and twenty-five dollars ($125) per month, payable as hereinafter provided, and five per cent. (5%) additional commissions on all sales of said office during the continuance of this contract.

"2. The party of the first part agrees, at its own expense, to open and fit up an office or salesroom for the use of the second party at said city, in which the party of the second part shall carry on said business, as herein provided for, and the party of the first part further agrees to sell and deliver to said second party such stock as it manufactures and sells as the trade of said office may require from time to time at forty per cent. (40%) discount from retail or list prices, and to supply merchandise at the same rate for all moneys received from said second party, and to instruct said second party in the details of handling the business until he is sufficiently instructed in the estimation of the said first party.

"At the expiration of the term and fulfillment of this agreement by said second party, the party of the first part further agrees to repurchase from said second party all stock that he may have on hand, purchased from said first party, paying therefor in cash the same prices originally charged him.

"In consideration of the foregoing and subsequent

agreements the said second party agrees to the following:"

1. (Abstracted): The party of the second part agrees to become sales agent of the party of the first part for two years, and that he will devote his whole time and efforts to advancing the success of the business, etc.

2. (Abstracted): Second party will supply no stock to purchasers that will in any way demoralize the trade, and only for cash or on short time on security, or to responsible parties. If second party uses due diligence in selling on credit, losses are to be charged as items of expense to business.

3. (In full): "Said second party further agrees to carry a stock of merchandise, amounting to One Thousand Six Hundred and Sixty-six Dollars, 66/100 ($1166.66) at retail or list prices, which shall be an assortment to be selected by the party of the first part, or jointly selected, and to be billed to said second party at Forty Per Cent. (40%) discount from retail prices, amounting to One Thousand Dollars ($1,000) net."

4. (In full): "The party of the second part further agrees to furnish the said party of the first part with daily and weekly reports, and at the end of each month to forward to the party of the first part a report of all business done during the month, giving the names and addresses of any and all agents appointed, a full and accurate statement of expenditures, amount of goods sold, of money collected, and other information regarding the business that may be desired by the party of the first part."

5. (In full): "As the permanent success of this business will depend upon a reasonable amount of merchandise being sold, it is understood and agreed that the sales of each month shall amount to Five Hundred Dollars, which shall be considered the minimum amount of business necessary to constitute the fulfillment of this contract. If the sales of any month shall not amount to the minimum amount, namely Five Hundred

Dollars, and during the succeeding month sales should be in excess of the minimum amount to make up an average of Five Hundred Dollars per month, this contract will thereby be fulfilled in this respect by the party of the first part.

"If the sales at the end of the first year shall not have averaged Five Hundred Dollars per month, the party of the first part reserves the right to cancel this contract, if it so desires, and upon such cancellation shall repurchase from said second party all stock that he may have on hand, purchased from said first party, at prices originally charged. All sales to be made by the said second party to agents at a discount of $33\frac{1}{3}$ per cent. and to dealers at 25 per cent. from list or retail prices."

6.    (In full) : "It is mutually understood and agreed between the parties hereto that said second party shall have the right and authority to collect all moneys for business done through said office, and that at the end of each month, after deducting from the receipts of said office the amount of his own remuneration, to-wit: One Hundred and Twenty-five Dollars, necessary expenses, such as rent, necessary office help, postage, advertising matter, office sundries and commission, all other expenses than those herein mentioned being subject to the approval in writing by the party of the first part, he shall remit with his monthly account the balance to said party of the first part at its office in the City of Chicago. When such remittance is received, the party of the first part shall then replace, as herein provided for, the stock sold during the previous month by the party of the second part, and in case the minimum amount of business required to be transacted shall not be sufficient to pay the necessary expenses of the office as herein provided for—cost of replacing stock sold— such deficiency shall be made good by the first party at the end of each month."

7.    (Abstracted) : In case of the death of second party before termination of contract, first party will

repurchase from the estate of said second party all stock on hand at prices originally charged.

8.   (Abstracted) :   Second party has the right to renew the contract on its expiration.

(Final paragraph—in full) :   "In consideration of the foregoing covenants and agreements to be kept and performed by the party of the first part, the party of the second part has this day paid to the party of the first part the sum of One Thousand Dollars, the receipt whereof is hereby acknowledged in payment of stock of goods as herein provided."

This is one of those peculiar agreements, becoming too common in enterprises of this kind, which are evidently purposely ambiguous.

It is impossible even to tell, from its seemingly inconsistent provisions, whether it is contemplated that the "stock of merchandise" "to be billed" to the second party at a thousand dollars, and to be replaced wholly or partly monthly by the party of the first part, and "to be replenished" in certain contingencies by him for the party of the second part, is to be actually the property of the second party or not.   From the language just quoted, and from the stipulation that the first party agrees "to sell and deliver it," it would seem that it was; but on the other hand, the first party does not call the second party a "purchaser," but "engages him" for a stipulated sum per month and a commission on his sales as "a sales-agent," to "conduct a sales agency;" and the second party agrees to become "a sales agent," and is to sell the goods only for prices and on conditions dictated by the first party, and then is not to be at the risk of losses from bad debts.   He is, moreover, to make to the first party daily, weekly and monthly reports of the business done, *and remit all his receipts less a fixed remuneration and office expenses to the first party,* in return for which the party of the first part is to replace the goods sold; and finally, it is *"in consideration of the foregoing covenants and agreements to be kept and performed by the party of the first*

*part*" (not in consideration of the merchandise) that the party of the second part "has paid to the party of the first part the sum of One Thousand Dollars," although "the receipt" of the same thousand dollars "is acknowledged in payment for a stock of goods as herein provided."

It is probable that in the event of successful sales of the merchandise involved and a failure to pay over the proceeds to the party of the first part, a construction would be put by the first party on the second party's rights different from that which would be adopted if the sales did not materialize.

It reminds one of the intention of the legendary sportsman to hit the moving game if it were a deer and miss it if it were a calf.

Since the final paragraph is not consistent with itself or with any one theory of the relations of the parties, it is not astonishing that there is ambiguity also in the provisions concerning the compensation to be paid to the party of the second part and the manner in which it is to be paid. Upon this ambiguity turns the decision of this cause. The party of the second part, the plaintiff in the case, contends that so long as he was not in fault and did the best he could in the business, the party of the first part agreed to pay him monthly a fixed stipend. The party of the first part (the defendant) insists that he only agreed that out of the proceeds of the sales which the plaintiff might make he might retain that certain amount monthly as remuneration. On this theory, if the plaintiff did not sell anything, he was to get nothing for pay.

If this last were the *bona fide* construction put by the party of the first part on the contract when it was made, we do not believe the minds of the parties ever met on it. However, the contract in question, after some preliminary correspondence, was signed by both parties, and the plaintiff proceeded to open an office in Rochester, under its provisions.

In accordance with the contract, plaintiff paid to the

defendant one thousand dollars and received from it a great variety of pictures and frames, "billed" at prices aggregating $1,000, and "listed" at prices amounting to $1,666.66, together with "instructions," etc., about the proper method of disposing of the same so as to make a profitable business.

The business was not a success. The office was opened on January 5, 1907. Mr. Barr made many complaints during the month of January to the manager of the Copying Company. He found the prices put on the pictures too high to compete with other dealers. Many of the pictures, he claimed, were imperfect, and the terms on which he was allowed to sell or to authorize sub-agents to sell were impracticable. Correspondence ensued on these lines—complaints by him and attempted justification by the Company's manager.

On January 31, 1907, Mr. Barr sent to the American Copying Company the following statement:

"ROCHESTER, N. Y., Jan. 31, 1907.
American Copying Company,
        Chicago, Ills.  Dr.
                To C. T. Barr, Manager,
                        Rochester Art Company,
                        "ROCHESTER, N. Y., Jan. 31, 1907.

MONTHLY STATEMENT for January, 1907.

Incidental Expenses:

| | |
|---|---:|
| Ink, Pens, City Guide, Screw Eyes, Cord, Hangers, Nails and other sundries, 50¢ 10¢ 94¢ 20¢ 44¢ 28¢ 30¢ 30¢ 05¢ 35¢ .................$ | 3.46 |
| 5 Incandescent lights for office (not furnished with room) at 18¢ ............. | .90 |
| Postage ...... ........................... | 1.44 |
| Advertising for Salesmen $2.34, $1.02, .84, .84. ........ ....................... | 5.04 |
| Lettering glass in door to Art Room (authorized by Mr. Utz) ................. | 1.00 |
| Office rent from Feb. 5, '07, to March 1, '07, one month...................... | 12.00 |
| Cleaning and varnishing office furniture (authorized by Mr. Utz)............... | 2.00 |

Barr v. American Copying Co., 142 App. 92.

Salary of Manager from Jany. 5, '07, to
Feb. 1, '07, 26 days at $125 per month
month ...........................    104.84

Total Expenses....................    130.68
Cr.
Picture No. 0283 sold 1 copy 50¢ less com.
33⅓ and 05%......................       .31

      Balance due for month of January    130.37
"Please remit with Chicago Draft and save expense
of collection."

After some inquiries concerning the failure to ac-
knowledge this communication had been made by Mr.
Barr, the Copying Company, under date of February
7, 1907, wrote him returning him the receipted bills,
"as" they say, "you will want to keep them on file."
They also say: "We regret to note that your sales for
the month have not reached the minimum amount as re-
quired in your contract, and we hope that during the
second month you will be able to make up for it, so that
the two months will average $500 per month, and if you
do, the total expenses and salary for two months may
be deducted from the receipts of the office."

Mr. Barr does not seem to have been overwhelmed
with these kind expressions, but wrote somewhat indig-
nantly in reply and desired a direct answer to the ques-
tion—"Do you propose that this office shall make sales
of pictures which are to be furnished or which are
furnished by you at your prices to the extent of $500
per month, or that shall average that amount through-
out the year, before you pay one cent for salary of the
manager or for office expenses?" He was unsuccessful
in his attempt to get the direct answer, the Company
contenting itself with "the simple explanation that we
propose to live up to the terms named in our contract
and will fully abide by all the conditions in it."

They "trusted that this would be satisfactory," but
it was not—to Mr. Barr at least; so after some further
correspondence, in which he offered unavailingly to

"step down and out" if the Company would take the pictures off his hands and release him from the contract, he informed them that he had been advised that the Company stood in default on the contract, "in view of which fact" he proceeded:

"I take this opportunity to notify you that I desire to cancel the contract that is now in existence between us, and I hereby make the following demand, viz:

"That you return to me the one thousand dollars that was paid to you by me on said contract, for which I stand ready to turn over to you all of the pictures that were received from you on the 5th ultimo, in the same condition as they were received by me from you.

"That you settle in full with cash or by bank draft for my statement of 31st ultimo, which represents the salary of your sales agent and other office expenses to that date, amounting in total to one hundred and thirty dollars and thirty-seven cents, and also that you settle in full with cash or bank draft my salary as your sales agent and other office expenses from February 1st, 1907, to date, amounting in full to one hundred dollars and sixteen cents. Grand total: One Thousand Two Hundred and Thirty Dollars and Fifty-three cents. See statement. * * *

"I make the above demand of you to give you an opportunity to settle the same in full before action is commenced to recover.

"I also inform you at this time that the pictures in question will be boxed forthwith and put in storage, where they will be at your disposal upon compliance with the above demands."

This demand was not complied with, and after further correspondence Barr brought suit against the Copying Company in the Municipal Court of Chicago, claiming $1,000.

The first bill of particulars stated the claim to be, "for damages for breach of contract entered into between the parties hereto on December 5, 1906."

An amended bill added thereto: "The amount claimed by the plaintiff is the sum of one thousand dollars ($1,000), being the amount advanced by the plaint-

iff to the defendant, which sum was to be returned to the plaintiff by the defendant upon plaintiff returning or tendering to the defendant certain pictures, and which said sum is due to the plaintiff by reason of the failure of the defendant to keep and perform the conditions in the above mentioned contract.''

During the trial Mr. Barr testified that the pictures sent to him by the defendant he had packed, and that they were in storage in Rochester at the room in which he had originally opened the business. Mr. Graham, the secretary and treasurer of the Copying Company, swore that none of the goods had ever been tendered back to the Company, after which he was asked if he was willing to accept the pictures that he had shipped to Mr. Barr and return him the thousand dollars. He answered ''No.'' Thereupon, however, counsel for plaintiff offered him the pictures and demanded of him the thousand dollars. But he declined to receive the pictures or turn over the money.

Following this the court found the issues for the plaintiff and assessed the damages at one thousand dollars and, after overruling a motion for a new trial, entered judgment for that amount.

We think the court was right. Without discussing in detail the testimony and documentary evidence which was admitted on the ground that it tended to explain and make clear the meaning which an ambiguous contract bore to the parties who executed it, we are prepared to say that an examination of it has brought us to the conclusion that the contract was understood by the plaintiff to mean that he was to get $125 a month salary and to have his office expenses paid so long as he followed instructions—did his best—or until a cancellation of the contract at the end of the first year, at the option of the Company, for failure to reach a stipulated minimum amount of business; and that it was intended by the managers of the Copying Company that he should so understand it.

If the ambiguity which manifestly exists in the con-

tract is latent, so that it can be explained by parol testimony, we are of the opinion that it has been explained so as to show the meaning of the contract to be that the $125 and office expenses which were demanded and refused at the beginning of February, 1907, were then due.

If, on the other hand, the ambiguity was, as it seems to us it was, patent, and it was and is for the court to interpret the contract, we think the proper interpretation for us to give to it is the same.

The salary is certainly not made expressly dependent on the sales reaching $500 a month, nor is it made payable *only* from the receipts of the office. Nor are we impressed with the strength of the argument that it is impliedly so made dependent or so exclusively payable. The argument is indeed to pay the sum "payable as hereinafter provided"—an innocent looking phrase enough in connection with a subsequent provision that the agent should be allowed to deduct it himself from the receipts before accounting for and remitting the balance. If ambiguity had not been desired, and the intention had been to make payment only possible by such deduction, the agreement would have said so.

We think that, construed solely by the light of its own provisions, it made the amount due which was demanded by the statement of January 31st.

If this amount was due, the defendant broke the contract by refusing payment of it.

If the defendant broke the contract in this essential matter, the plaintiff had the right to treat it as cancelled and sue for damages; and, in view of the ambiguity of the contract as to the consideration for the thousand dollars and the ownership of the goods for which the amount was ostensibly paid, he had the right to claim, as a part of those damages, the thousand dollars which he had paid, and to hold the goods at the order of the defendant upon repayment.

It is needless to discuss further than we did at the beginning of this opinion the peculiar character of the

phrasing of the contract under which this $1,000 was paid. It was to our mind more in the nature of a deposit or security for the goods delivered to the agent, than purchase money.

Finally, if the written contract was incurably uncertain from ambiguity, the same results would follow from the condition of affairs shown by the evidence outside of the contract.

In any view, the plaintiff evidently claimed less than he was entitled to, in order to bring the case within the fourth class of cases in the Municipal Court, and he has recovered no more than he claimed.

The judgment of the Municipal Court is affirmed.

*Affirmed.*